## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

| | |
|---|---|
| DR. BRIAN L. GERBER,<br><br>       Plaintiff,<br><br>    v.<br><br>THE BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, DR. RICHARD A. CARVAJAL, *in his official capacity as the President of Valdosta State University*, and HEIDI COX, *in her individual capacity*,<br><br>       Defendants. | Case No:<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Dr. Brian L. Gerber ("Dr. Gerber") hereby files this Complaint to recover damages and other available remedies against Defendants The Board of Regents of the University System of Georgia, Dr. Richard A. Carvajal, in his official capacity as President of Valdosta State University, and Heidi Cox, in her individual capacity (collectively, the "Defendants"), respectfully showing the Court the following:

## INTRODUCTION AND SUMMARY OF THE CASE

1.      This case is about what happens when a public institution—Valdosta State University ("VSU" or the "University") and its personnel—commits acts that

1

may violate state law and policies, and then, circling the wagons, looks for a "fall guy" to shield itself and its personnel from potential fallout from those actions. This case is also about what happens when an auditor of that same institution, Heidi Cox ("Cox"), rushes to conclusions and engages in confirmation bias—the end result of which is that the fall guy loses a cherished decades-long career as an educator, and the community he serves loses a dedicated servant and tireless advocate.

2.     That fall guy is the plaintiff in this case, Dr. Brian L. Gerber, who dedicated almost the entirety of his professional life to VSU, a public university within the University System of Georgia ("USG") that is governed by the Board of Regents of the University System of Georgia ("Board of Regents"). In a career spanning nearly 30 years, Dr. Gerber rose through the ranks to become a tenured Professor and the Director of VSU's STEAM Center for Applied Creativity and Innovation.

3.     During his time at VSU, Dr. Gerber did not simply teach; he was also actively involved in his community in a multitude of ways. Relevant here, Dr. Gerber's community involvement included running a 501(c)(3) organization that spun off from VSU; running an annual holiday fundraiser for the Valdosta Early College Academy (a program run by VSU and the Valdosta City School System that allows middle and high school students to earn both a high school diploma and

college credits); and, as Director of the STEAM Center, running a summer camp for children in foster care on VSU's campus.

4.      During the course of a campus-wide audit on certain university programs involving minors, the auditor in question, Cox, identified what she considered to be "accounting errors" relating to the programs run by Dr. Gerber (a non-accountant). Based on these alleged accounting errors, Cox quickly leapt to the conclusion that Dr. Gerber had intentionally "misappropriated" state funds and committed "fraud"—despite the fact that Dr. Gerber fully participated in Cox's investigation by voluntarily sitting for three, hours-long interviews with Cox and provided her with the documentation she requested from him, and despite the fact that there was no evidence whatsoever that Dr. Gerber personally benefitted from the alleged misappropriation.

5.      Cox also reached the conclusion that Dr. Gerber alone was responsible for the alleged accounting errors—despite the fact that innumerable executives, other employees, and departments at VSU and within the University System of Georgia ("USG") played a role in approving, authorizing, and sanctioning the actions Dr. Gerber took. But Cox, by her own admission, was deeply concerned about how bad it would look "on the front page of the newspaper" if the actions of VSU and the USG became public. So someone—Dr. Gerber—had to be held solely

responsible for the collective actions of everyone, in order for VSU to protect itself from scrutiny.

6.     Cox's efforts to protect the University ultimately resulted in her recommendation that VSU take "administrative action" against Dr. Gerber. VSU accepted Cox's recommendation and offered Dr. Gerber this false choice: face termination (at the age of 64) through an uncertain disciplinary process, or retire "with full benefits." Dr. Gerber made the only "choice" a rational person of retirement age would make: he accepted this forced retirement based on VSU's assurances that retirement "with full benefits" meant exactly that. One such benefit of retirement Dr. Gerber understood and expected he would receive was the ability to be rehired either by VSU or by a different institution within the University System of Georgia in the future.

7.     Thinking the terms of his retirement agreement resolved the matter, Dr. Gerber tried to move on—and was approached by another USG institution regarding potential employment. Only then did Dr. Gerber learn that VSU—without notice or hearing—had designated him as "ineligible for rehire." Dr. Gerber appealed, asked for a hearing, and requested documents. All these requests were ignored or denied.

8.     These actions by the Board of Regents, VSU, and Cox violated the Fourteenth Amendment to the United States Constitution and Georgia law.

Accordingly, Dr. Gerber brings this action to remedy the harm caused by these violations.

9.    Specifically, Dr. Gerber asserts a claim against Dr. Carvajal, in his official capacity as VSU's President, for VSU's violation of his procedural due process rights under 42 U.S.C. § 1983 (Count I) and violation of the Open Records Act, O.C.G.A. § 50-18-73, for failing to respond timely and completely to Dr. Gerber's requests for documents (Count V). Dr. Gerber further asserts claims against the Board of Regents for breach of his employment and retirement agreements (Counts II and III). Dr. Gerber also asserts a defamation claim against Heidi Cox, in her individual capacity, for the false and defamatory statements she made about Dr. Gerber after his retirement (Count IV). Finally, under 42 U.S.C. § 1988 and Georgia law, Dr. Gerber seeks to recover his attorneys' fees and expenses of litigation against the Board of Regents, VSU, and Cox.

## **PARTIES**

10.    Plaintiff Dr. Brian L. Gerber is an individual residing in Lowndes County, Georgia.

11.    Defendant The Board of Regents of the University System of Georgia is an agency of the State of Georgia. The Board of Regents governs and manages the University System of Georgia and its member institutions, including Valdosta State University. As such, VSU is an agent of USG. The Board of Regents may be served

5

with process through its Vice Chancellor of Legal Affairs, Christopher McGraw, its Associate Vice Chancellor of Legal Affairs, Stephanie Morrison, and its Assistant Vice Chancellor of Legal Affairs, Josiah Heidt, at their usual place of business at the Office of the Chancellor, Board of Regents of the University System of Georgia, 270 Washington Street, SW, Atlanta, Georgia 30334.

12.     Defendant Dr. Richard A. Carvajal is an individual residing in Lowndes County, Georgia. Dr. Carvajal has been the President of Valdosta State University since January 1, 2017.

13.     Defendant Heidi Cox is an individual residing in Lowndes County, Georgia.

## JURISDICTION AND VENUE

14.     This action arises, in part, under the United States Constitution and 42 U.S.C. § 1983. It also arises under Georgia state law.

15.     This Court has subject-matter jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343, and 1367.

16.     This Court has supplemental jurisdiction over Dr. Gerber's state law claims pursuant to 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over the Defendants because, among other reasons, they committed tortious acts or omissions and breached contracts in Lowndes County and Fulton County, Georgia.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts that gave rise to this lawsuit occurred in this judicial district. Specifically, the Plaintiff (Dr. Gerber) and two of the three Defendants (Dr. Carvajal and Cox) reside in Lowndes County and in the Middle District of Georgia. A substantial part of the events or omissions giving rise to Dr. Gerber's claims (indeed, potentially, all of the relevant events) occurred in Lowndes County and at Valdosta State University. As such, the convenience of the parties and witnesses, the location of relevant documents, the relative ease of access to sources of proof, the locus of operative facts, the availability of process to compel the attendance of any unwilling witnesses, the relative means of the parties, the weight accorded a plaintiff's choice of forum, and trial efficiency and the interests of justice, based on the totality of the circumstances, all favor resolving this dispute in Lowndes County and in the Middle District of Georgia.

## **ALLEGATIONS**

### *Dr. Gerber Serves the VSU Community with Distinction for Decades*

19.     In 1996, Dr. Gerber joined the faculty of VSU as an Assistant Professor of Science Education. He spent close to the entirety of his career in higher education at VSU, dedicating himself to the University and the communities and region it serves.

20.    Dr. Gerber served at VSU for nearly three decades. Over the course of his decades-long career at the University, he was entrusted with numerous positions as an educator and in executive leadership—ranging from Assistant Professor to Associate Professor; to Associate Dean; then Director of Curriculum, Instruction, and Outreach; then Interim Dean of the College of Education and Human Services; then Interim Provost and Vice President of Academic Affairs; and, ultimately, Dr. Gerber became the Faculty Coordinator and Director of VSU's STEAM Center for Applied Creativity and Innovation (the "STEAM Center").[1]

21.    Dr. Gerber served as Director of VSU's STEAM Center from 2017 until his forced retirement from the University in 2025.

22.    While at VSU, Dr. Gerber received universally positive evaluations and was awarded tenure in 2003.

### Programs at VSU with which Dr. Gerber was Involved

*Dr. Gerber's Involvement with the Science & Technology Museum of Atlanta ("SciTrek"), later acquired by VSU*

23.    While at VSU, one of Dr. Gerber's focuses was on ensuring students and the broader South Georgia community had the greatest access possible to science education materials. In light of that lifelong passion, Dr. Gerber was familiar with the institution known as the Science & Technology Museum of Atlanta

---

[1]    "STEAM" is an acronym for Science, Technology, Engineering, Arts, and Mathematics.

("SciTrek"). This version of SciTrek was registered with the state under the name "SciTrek Foundation, Inc."

24.     SciTrek was a beloved science and technology museum that operated in Atlanta from 1988 to 2004. It was formerly located at the Atlanta Civic Center, and is shown here:



The entrance to SciTrek, November 18, 2005, *Wikimedia Commons/Scott Ehardt*

25.     In its heyday, SciTrek was known for its multitude of interactive, hands-on exhibits. For example, SciTrek included this Mission to Mars exhibit:



Students at the SciTrek Mission to Mars exhibit, 1992. *AJCP299-029f, Atlanta Journal-Constitution Photographic Archives. Special Collections and Archives, Georgia State University Library.*

26.    Eventually, SciTrek's offerings grew to include grander exhibits such as the Challenger Learning Center, a large-scale model of the NASA space shuttle mission that opened in 2003.

27.    At its peak, SciTrek featured over 140 exhibits designed to help children of all ages learn about science and STEAM fields in an accessible and fun way. Amongst its many honors, in 2001, SciTrek was recognized as one of the 10 best science museums in the United States by Good Housekeeping magazine.

28.    But despite its popularity, SciTrek experienced financial difficulties. Despite receiving grants and injections of funding from the state, SciTrek ultimately did not have the resources to continue its operations and closed its doors on August 27, 2004.

29.    Following its closure, SciTrek began a process for selling or auctioning off its assets (including its exhibits). Some of SciTrek's assets found a new home in Atlanta, such as the Challenger Learning Center relocating to the Fernbank Science Center.

30.    Dr. Gerber (at this time, a Professor and Associate Dean at VSU's College of Education and Human Services) learned of SciTrek's anticipated closure in the newspaper. Upon learning this news, Dr. Gerber believed that SciTrek's closure presented the opportunity to bring some of SciTrek's exhibits to South Georgia, and to thereby enhance science and mathematics education in that community and region. Dr. Gerber contacted VSU's then Dean of the College of Education and Human Services, Dr. Philip Gunter, who relayed the message to then Provost Dr. Louis Levy and then President, Ronald Zaccari. All agreed that expressing interest in the assets SciTrek intended to auction or sell was a worthwhile pursuit.

31.    Together, Dr. Gerber, President Zaccari, Provost Levy, and Dean Gunter endeavored to acquire, on behalf of VSU, some of the assets that SciTrek would be auctioning or selling. For example, in early September 2004, President Zaccari sent a written proposal—entitled "SciTrek Partnership with Valdosta State University"—to SciTrek's Board of Directors to convey VSU's interest. President Zaccari subsequently had a phone conference with some of SciTrek's board

members to further express VSU's interest, and again expressed that interest in a

follow-up letter.

32.     Ultimately, in October 2004, President Zaccari, Dean Gunter, and Dr.

Gerber made a formal presentation to SciTrek's board. Their efforts in championing

VSU's interest in SciTrek were successful. In late 2004, SciTrek's board voted to

award certain of SciTrek's assets to VSU—namely, "the SciTrek 501(c)(3) brand";

plans and intellectual property associated with a planned "Communications

Pavilion" exhibit; "all remaining restricted class funds not returned to the original

donors after settlement"; and the potential for two mobile laboratories relating to the

Challenger space shuttle.

33.     SciTrek's official award letter to VSU, addressed to President Zaccari,

is shown here:




597 Piedmont Avenue
Atlanta, Georgia 50508

December 6, 2004

Dr. Ronald M. Zaccari
Office of the President
Valdosta State University
1500 North Patterson Street
Valdosta, Georgia 31698-0180

Dear President Zaccari:

We are please to inform you that the SciTrek Board of Directors –
Transition Committee met on Tuesday, 30 November 2004 and made the
decision to award and transfer to VSU the SciTrek 501 (c)(3) brand.
There are two exceptions which are the CLC and the restricted class
funds associated with the Communications Pavilion.

However, it is our intent to turn over to you all work and IP completed
to date on the Communications Pavilion, as well as, connect you with
the two design firms we had contracted with to build out the first
center. They are Logic Junction and COSI Design Studios. It is also our
intent to pass through all remaining restricted class funds not
returned to the original donors after settlement. Final amount to be
determined within thirty days of transfer.

Further, and on your behalf, we negotiated with The Challenger Learning
Corporation the possibility of them awarding VSU two 'mini-CLC' labs
capable of fitting inside mobile lab environments. The Goddard Space
Flight Center had previously requested and agreed to support the build
out of mobile science labs and we offered VSU as a test model. Assuming
you support this, The Challenger Learning Corporation folks have agreed
to meet with you to begin discussing the possibilities.

The potential to pull off a state wide science education initiative is
still within our grasp. This appears to be a win-win-win for all
involved.

On behalf of our board of directors, we would like to congratulate you
on your model and presentation. VSU simply did the best, most
professional job articulating a vision for the SciTrek brand.

Thank you!

Sincerely,

Scott Coleman                           Alan Neely
Co-Chairman, SCiTrek                    Co-Chairman, SciTrek

Cc:    Brian L. Gerber, Ph.D., Associate Dean
       Louis H. Levy, Ph.D., Vice President of Academic Affairs
       Philip L. Gunter, Ph.D., Professor and Dean

34.    As SciTrek's board stated, in winning the race for these highly sought after resources, VSU "simply did the best, most professional job articulating a vision for the [future of the] SciTrek brand."

35.    President Zacarri, on behalf of VSU, accepted SciTrek's award by letter dated December 20, 2004. VSU, through President Zacarri, accepted the SciTrek award with a goal of establishing a "science and mathematics center" at VSU "that [would] include the SciTrek name."

36.    Following VSU's acceptance of the SciTrek award, Dr. Gerber worked closely with SciTrek's CFO to facilitate the transition of the acquired SciTrek assets to VSU and to iron out the finer details of the transition. Those finer details included, among other things, planning for the transfer of SciTrek's 501(c)(3) status to VSU and the funds in its bank accounts (much of which was either restricted or allocated).

37.    Following a meeting of SciTrek's Board of Directors on January 25, 2005 (wherein the board approved the transfer to VSU, the existing board members resigned, and a new set of Valdosta-based members were appointed), SciTrek's transfer of the designated assets to VSU became effective on February 1, 2005.

38.    To facilitate the transition of those assets, and with the full knowledge and support of VSU, Dr. Gerber created a new 501(c)(3) named "SciTrek, Inc." Dr. Gerber also became the principal officer of SciTrek, Inc. and was appointed, by President Zaccari, to manage its assets on behalf of VSU. In that capacity, Dr.

14

Gerber was responsible for forming a new SciTrek board and managing the new SciTrek entity (including by stewarding the funds in SciTrek's bank accounts).[2]

39.    Later in the year, VSU's College of Education hired a former internal audit director at VSU, who had recently retired, to assist Dr. Gerber in figuring out and managing SciTrek's financial affairs.

40.    Under Dr. Gerber's guidance, SciTrek obtained a VSU agency account, which ensured VSU had visibility into SciTrek's financials.

41.    Though it was not known at the time, it appears that the VSU personnel involved in the SciTrek acquisition may not have obtained all the state approvals necessary to accept the award from SciTrek (either in whole or in part).

42.    For example, the Board of Regents did not vote to approve the SciTrek acquisition until April 19, 2005 (after months of discussion between VSU and SciTrek about the acquisition, and after the effective date of SciTrek's board vote to approve the transfer).

43.    What's more, it is unclear as to whether the Board of Regents approved the acquisition of all of the assets that VSU purported to acquire from SciTrek, or just some of those assets. But it appears that the assets VSU accepted from SciTrek may have been more expansive than the assets the Board of Regents ultimately

---

[2]    Though nominally distinct, this Complaint refers to both SciTrek Foundation Inc. and SciTrek, Inc. as "SciTrek" unless indicated otherwise.

approved acquiring. However, a 2025 administrative review of these issues (discussed further later in this Complaint) is inconclusive on this point—having found only that "[w]ithout prior BOR approval, actions by VSU personnel may have violated state policies."

44.    What is clear is that, eventually, VSU's Office of Legal Affairs, USG's Office of Legal Affairs, and the state Office of the Attorney General became concerned about various legalities related to VSU's acceptance of the SciTrek assets, including myriad potential liabilities. Records from 2005 and 2006 show that, among other things, the Office of Legal Affairs and Office of the Attorney General raised concerns about the Board of Regents' vote on the acquisition taking place after VSU accepted the acquisition; that the scope of the "gift" the Board of Regents voted to accept from the original SciTrek was narrower than the "entire not-for-profit organization" the attorneys concluded VSU had accepted; that VSU (a state agency) could not operate a 501(c)(3) corporation (like SciTrek, Inc.); and that VSU had acquired certain liabilities from SciTrek without any concomitant indemnification from SciTrek Foundation, Inc. (which, by then, no longer had a board and was no longer operational, but had not yet been dissolved with the Secretary of State).

45.    Additionally, a significant portion of the cash VSU received from SciTrek was "restricted" to certain uses by the donors who made those donations to

SciTrek Foundation, Inc. For example, some of the funds had been designated for the development of the two mobile labs in conjunction with the Challenger Learning Center—but the Challenger Learning Center had decided it would not proceed with those particular projects. As another example, some of the funds had a "metro" designation—meaning that they could only be used by SciTrek in the metro Atlanta area. Accordingly, this meant that the funds could not be used by SciTrek at VSU or in the South Georgia region.

46.     Because SciTrek's board had resigned during the same January 2005 meeting in which it voted to transfer the assets to VSU, there was no SciTrek entity to which those assets could be returned.

47.     It eventually became clear that the Board of Regents (and perhaps the state) wished to "wash its hands" of SciTrek, given myriad concerns about the timing, scope, or legality of the acquisition. And to that end, the Office of the Attorney General advised Dr. Gerber that the new SciTrek entity should retain its own professional advisors (including attorneys and accountants).

48.     Dr. Gerber did as the Attorney General's office suggested—he directed that SciTrek retain professional advisors to guide it through the quagmire that the Board of Regents' rejection of SciTrek's assets had caused.

49.     Ultimately, after literally years of examining this complex issue, and with the advice of numerous legal and financial advisors, and VSU administrators, it

was determined that Dr. Gerber would continue to run SciTrek without the direct involvement of any other personnel at VSU. Dr. Gerber personally undertook this responsibility in order to insulate VSU and other personnel at the University from liability arising from certain actual and potential claims against the original SciTrek entity.

50.    Thus, in 2011, Dr. Gerber became SciTrek's only officer—its CEO, CFO, and Secretary.

51.    Dr. Gerber's continued management and operation of SciTrek was not a secret. Numerous executives at VSU were involved in (i) the acquisition of the SciTrek brand and assets; (ii) discussions with VSU's Office of Legal Affairs, USG's Office of Legal Affairs, and the state Office of the Attorney General about VSU's acceptance of that acquisition; (iii) the decision that SciTrek could not be operated by VSU directly in light of the Board of Regents' rejection of the gift/acquisition; and (iv) the decision that Dr. Gerber would operate a new SciTrek on his own.

52.    Dr. Gerber also obtained a written acknowledgement from Dr. Louis H. Levy, by then, the interim President of VSU, that SciTrek would retain the restricted funds that VSU had declined. As such, it was also not a secret that (i) the new SciTrek would retain the funds that had been transferred to it by the original SciTrek entity, and (ii) consequently, those funds would not be remitted to VSU (or any other organ of the state) because the Board of Regents determined that it would reject

those funds because it did not want to take on any potential liabilities. The Board of Regents' rejection of those funds is the sole reason the funds remained with the new SciTrek entity.

53.    Further, throughout the ensuing years, Dr. Gerber consistently disclosed his position and continued affiliation with SciTrek on his annual disclosures to VSU.

*The Valdosta Early College Academy ("VECA") Fundraiser*

54.    During his time at VSU, Dr. Gerber also ran an annual fundraiser for Valdosta Early College Academy ("VECA").

55.    VECA is a partnership between the Valdosta City School System and Valdosta State University that began in 2008. The program allows middle and high school students to earn both a high school diploma and college credits by the end of their 12th grade year.

56.    Annually, VECA holds a fundraiser by selling pecans during the holiday season.

57.    Historically, various pecan products could be ordered from VECA during the fundraiser by completing a short order form on a flyer for the fundraiser, including by providing a debit or credit card number to pay for the order, as shown here:

58.    But in 2020, VSU decided it no longer wanted to accept orders in this manner, given the sensitivity of collecting this debit and credit card information.

59.    The resultant inability to process payment transactions would have adversely impacted the VECA fundraiser, because the vast majority of VECA donations to this fundraiser came via the card information provided on these flyers.

60.    Dr. Gerber consulted with various VSU officials, hoping to find an alternative way to accept orders. Eventually, Dr. Gerber and his assistant came up

with the idea of creating a Shopify account to accept pecan orders through a website

hosted by Shopify. That website was www.myveca.org, is shown here:





61.     In order to accept orders online, Shopify requires that its users provide

a bank account into which sale proceeds can be deposited. Dr. Gerber spoke with

officials at Valdosta State University Foundation, Inc. (the "VSU Foundation" or

"Foundation")[3] to ask that the Foundation provide its bank account information so

_____

[3]     The VSU Foundation is a 501(c)(3) nonprofit corporation that supports the
mission of VSU. According to its website, "[t]he Foundation's primary efforts shall

that the sale proceeds could be deposited there. However, the VSU Foundation

declined to supply the necessary information for any of its bank accounts.

62.     In light of the Foundation's declination, Dr. Gerber authorized the use

of SciTrek, Inc.'s bank account (the "SciTrek Account") to receive and hold the

proceeds of the pecan sale.

63.     SciTrek, Inc. held all proceeds from the VECA fundraiser. All proceeds

from the VECA fundraiser are accounted for and have been used for, or are available

for, the benefit of VECA and its students.

64.     Dr. Gerber did not personally benefit from the VECA fundraiser in any

way.

*Dr. Gerber and the STEAM Center Host Foster Kids at a 2023 Summer Camp*

65.     In 2022, Dr. Gerber was asked by Dawn Cooper (the Assistant Vice

Chancellor of College Access Initiatives for the Board of Regents) to run a summer

camp at VSU for children in foster care. Such summer camps are held annually on

the campuses of public universities throughout Georgia. But, until Dr. Gerber was

approached about running this camp at VSU, VSU had not participated in running

one of these camps.

---

be directed toward attracting, receiving, investing, managing, and expending gifts
and other resources designated for the educational programs of the University." *See*
https://www.valdosta.edu/administration/advancement/vsu-foundation/.

66.    Because Dr. Gerber did not have specific expertise in working with or developing programs for children in foster care, he asked Enay Coaching, LLC ("Enay") to assist him in running the camp. Enay is a for-profit leadership development company that works with troubled and disadvantaged youth.

67.    Enay is experienced in developing, planning, and implementing education and job skills training programs for youth in foster care. It is run by Elton Dixon, a well-respected military veteran who is a board member of the Valdosta-Lowndes County Chamber of Commerce and a board member of the South Georgia Workforce Development Board. Dr. Gerber knew Dixon because the two had been introduced to one another by VSU President Zaccari many years prior.

68.    Dixon and Enay agreed to work with Dr. Gerber in designing and running the summer camp. On information and belief, VSU's camp was the only such camp in the state where the hosting university had partnered with a subcontractor to run the camp. The issues that followed resulted from VSU's lack of experience with running such a camp (in general) and its lack of experience in running such a camp in conjunction with an outside organization (in particular).

69.    In March 2023, USG approved the grant proposal for VSU's version of the camp. The USG would then develop a Service Level Agreement ("SLA") for the project. Under the SLA, Dr. Gerber was designated as the "principal investigator" for the contract. And, as part of that SLA, VSU's STEAM Center (for which Dr.

23

Gerber was the director) would host a summer camp for a group of about 20 kids in foster care. Dr. Gerber would supervise the camp, while Enay would run it. The camp was slated to run from June 21 to June 23, 2023.

70.     Dr. Gerber did not sign the SLA and was not a party to the contract. The SLA was signed and approved by Lisa Little, the USG's Assistant Vice Chancellor of Strategic Sourcing; Mary Dennis, USG Legal Counsel; and Teresa MacCartney, then the Board of Regents' Chief Operating Officer.

71.     But after *months* of administrative delays outside of the control of Dr. Gerber and Enay, the SLA had not been finalized, and, as a result, VSU had not yet received any funding for the camp. Further, Dr. Gerber understood, from discussions with various personnel at VSU, that the "books were closed" now that it was the summer. As a result, there was great uncertainty as to whether the funding would arrive and, if so, whether it would arrive in time for purchases supporting the camp.

72.     For this reason, the USG changed the SLA from between the USG and Valdosta State University to between the USG and the Valdosta State University Foundation. This allowed the camp to proceed through reimbursements after the camp had occurred, rather than through purchases before the camp started.

73.     The weekend before the camp was slated to begin on June 21, Dr. Gerber and Enay were thus faced with a dilemma: they had assumed responsibility for hosting a camp for children, and those children were slated to arrive on the VSU

campus for that camp in a mere four days, yet they had not received any funding with which they could run the camp. Placed in this position, and with VSU providing no clarity as to when funding might come through, Dr. Gerber and Dixon decided that Enay would front all the expenses for running the camp and would later seek reimbursement from the VSU Foundation for those expenses. Further, Cooper and personnel with the VSU Foundation assured Dr. Gerber and Dixon that, if Enay fronted the camp's expenses, Enay would be fully reimbursed.

74.    Only as a result of that decision was VSU able to put on the camp promised to the participating foster children.

75.    The final version of the SLA was not finalized until June 21, 2023—the day the camp began. But of course, funding arriving the day the camp starts does not help pay vendors (such as food services and bus drivers), buy supplies, or pay camp staff (such as camp counsellors) as would be necessary before the start of the camp. Actual funding from the USG for the camp did not arrive until later, and was deposited into the Foundation's account on August 2, 2023. This is long after Enay was paid (on July 11, 2023) for their services and did not help pay the camp's vendors.

76.    Unsurprisingly, the actual cost to run the camp differed from the estimated budget that had been prepared several months prior. In fact, because of the USG's delay in finalizing the SLA, expenses associated with securing camp staff,

vendors, and activities were higher than originally projected. As such, the expenses for which Enay was reimbursed were greater than the initially projected costs of running of the camp.

77.    Enay used some of their profits and other company resources to make a $7,000 donation to the VSU STEAM Center (run by Dr. Gerber), a donation to the UGA Fanning Institute for Leadership Development, and other donations to groups that work with the foster population in the local community.

78.    Heidi Cox later construed this $7,000 donation to *the STEAM Center* (not to Dr. Gerber) as an improper "kickback" to Dr. Gerber. In other words, Cox and VSU theorized that Dr. Gerber threw away his meaningful, three-decades-long career in education—a career that he loved—all for the sake of a $7,000 donation made not to him, but to an organization he directed.

79.    The $7,000 donation was paid by check, not made in cash. A "VSU Foundation Deposit Request" discloses the $7,000 as a "donation." A "Project Activity Report" discloses the "gift."

### Heidi Cox Institutes an Administrative Review that Reached Demonstrable False Conclusions

80.    Heidi Cox joined VSU in 2016 as its Director of Internal Audit, and became its Chief Audit Officer in June 2025.

81.    Under Cox's direction, in 2024, VSU undertook an audit of all VSU programs involving "minors on campus"—essentially, all VSU programs and

activities wherein non-student minors were on VSU's campus. The 2023 summer camp for youth in foster care was one of the programs that fell into the category of "minors on campus."

82.    On April 23, 2024, Cox and the Office of Internal Audit completed a sample testing of VSU's camps, which identified supposed accounting issues with the 2023 summer camp for youth in foster care. Based on that audit, Cox and VSU decided to conduct an internal review into Dr. Gerber (the "Administrative Review").

83.    Dr. Gerber participated fully and transparently in the Administrative Review. He voluntarily sat for three separate, hours-long, recorded interviews with Cox and her colleague, Jeanine Y. Boddie-LaVan, a Chief Human Resources Officer. Dr. Gerber also provided ample documents and information to Cox—including records dating back to 2004, when VSU acquired (but later abandoned) the SciTrek assets. Dr. Gerber did so alone, without legal representation, and entirely on his own accord—because he had nothing to hide.

84.    Dixon, similarly, also voluntarily sat for a recorded interview with Cox and Boddie-LaVan, and provided to them documents and information that they requested.

85.    Despite this, the resulting Administrative Review report prepared by Cox was rife with errors, misleading misstatements, and unsupported conclusions.

And it is this damning report—"Prepared for General Counsel Use"—that ultimately led VSU to force Dr. Gerber into a retirement he did not want or seek.

86.    For example, according to Cox's Administrative Review report, "State funds designated for a 2023 USG Foster Camp Grant were misappropriated and administered by Dr. Brian Gerber." This is not true. Dr. Gerber did not misappropriate state funds.

87.    In reality, Dr. Gerber was not responsible for approving the SLA and played no role in determining with whom the Board of Regents contracted for that agreement.[4] Dr. Gerber's role was in submitting an estimated budget (approved by the requisite University personnel) and overseeing a successful camp—which he did. After receiving reimbursement from the VSU Foundation, Enay donated some of that money to the STEAM Center, not Dr. Gerber personally. Dr. Gerber did not personally benefit from this donation and has never used this donation in any unauthorized, unlawful, or improper way.

88.    The Administrative Review report also claimed that Dr. Gerber misappropriated funds from the VECA pecan fundraiser. This is not true either. Dr. Gerber did not misappropriate any proceeds from any VECA pecan fundraiser.

---

[4]    Cox also later concluded that the SLA should have been a contract between the Board of Regents and VSU itself, rather than the Board of Regents and the VSU Foundation. But Dr. Gerber played no role whatsoever in determining with whom the Board of Regents should have contracted.

89.    In reality, Dr. Gerber offered the use of the SciTrek Account to facilitate donations to VECA. VECA has received, and continues to receive, the money Dr. Gerber collected through the fundraiser on VECA's behalf. Dr. Gerber did not personally benefit from the VECA fundraiser and has never used this money in any unauthorized, unlawful, or improper way. Moreover, Dr. Gerber offered the use of SciTrek's Account only after the VSU Foundation declined to provide its own bank account information for purposes of collecting proceeds from the pecan sale.

90.    The Administrative Review report further claimed that the SLA for the 2023 Summer Camp exhibited improper accounting and was not properly routed and finalized with VSU officials. The Administrative Review report implies that these irregularities "prove" Dr. Gerber had some secret agreement with Enay to fraudulently obtain state funds. This, too, is false.

91.    In reality, the first draft of the SLA was prepared months in advance of the 2023 summer camp. The SLA approval process was not done covertly and, in fact, involved numerous employees of the Board of Regents, including Lisa Little (Assistant Vice Chancellor of Strategic Sourcing), Mary Dennis (USG Legal Counsel), and Teresa MacCartney (then Board of Regent's Chief Operating Officer).

92.    At bottom, just one overarching problem with Cox's conclusions is that alleged accounting errors—made by non-accountants like Dr. Gerber with no training in finance or procurement, and no role in approving contracts or funding

requests submitted to various departments in the University System of Georgia—do not amount to evidence of misappropriation.

93.    The Administrative Review report nevertheless contained several recommendations, including:

    a.    "Due to the misappropriation of state funds and serious ethical lapses made by the Director of the STEAM Center [i.e., Dr. Gerber], VSU should take appropriate administrative action";

    b.    "The $7,000 contribution to the STEAM Center and made by Enay with state appropriations should be repaid to VSU"; and

    c.    "The annual VECA pecan fundraiser funds of $111,288 collected by Dr. Gerber should be reimbursed to the VSU Foundation VECA account."

94.    In exercising her auditing duties in investigating Dr. Gerber and preparing the Administrative Review report, Cox acted recklessly and without due care.

### Dr. Gerber was Forced to Retire Following the Administrative Review

95.    During one of his interviews, Cox and Boddie-LaVan showed Dr. Gerber, on a screen, a draft of the Administrative Review report. They did not provide him with a physical or electronic copy of the report in advance of the meeting, or during it. Nonetheless, despite being blindsided by the conclusions

stated in the draft report, Dr. Gerber responded to the report's allegations and attempted to correct and clarify them in real time. Cox, undeterred, persisted in her erroneous conclusions.

96.    In early 2025, shortly after Cox issued her Final Investigative Report, VSU resolved to force Dr. Gerber out. VSU did so based on Cox's recommendation that "appropriate administrative action" should be taken against Dr. Gerber.

97.    On March 17, 2025, VSU's Interim Provost, Dr. Sheri Noviello, placed Dr. Gerber on administrative leave on the grounds that "compelling evidence . . . substantiates the allegation of state fund misappropriation and other serious ethical violations." Dr. Noviello also offered him the opportunity to "explore a mutual settlement." The March 17, 2025 letter offering this settlement is attached hereto as Exhibit 1.

98.    On March 25, 2025, Dr. Noviello emailed Dr. Gerber and offered Dr. Gerber the option to "voluntarily separate" from VSU.

99.    On March 26, 2025, an attorney for Dr. Gerber spoke with VSU's Chief Legal Affairs Officer, Justin Arrington. During that conversation, Arrington confirmed that this voluntary separation meant that Dr. Gerber "can retire and retain all his retirement benefits." Dr. Gerber's attorney confirmed this conversation in an email, which is attached hereto as Exhibit 2.

100.    Based on the representations made by VSU's attorney, on March 28, 2025, Dr. Gerber accepted VSU's offer to retire as Professor and Director of the STEAM Center, effective April 1, 2025. Dr. Gerber explicitly stated that, in accepting VSU's offer of retirement, he was "relying on Justin's explanation" of the terms of his retirement. Dr. Gerber further stated his understanding that, by accepting this offer, "the matters mentioned in the March 17, 2025 letter from Sheri [Noviello]" were concluded. A copy of Dr. Gerber's retirement letter is attached as Exhibit 3. VSU was aware of Dr. Gerber's understanding.

101.    On March 31, 2025, VSU President Richard A. Carvajal accepted Dr. Gerber's retirement letter. In so doing, President Carvajal thanked Dr. Gerber for "all [he] ha[d] done for our campus," the "positive impact [he] had on our students as a Professor and Director of the STEAM Center," and the "time and talent" he had invested. President Carvajal further expressed his "appreciation for [Dr. Gerber's] dedication to Valdosta State University" and stated "VSU is a better place because of [Dr. Gerber's] time here." A copy of President Carvajal's March 31, 2025 letter is attached hereto as Exhibit 4.

102.    This correspondence constitutes a binding contract between Dr. Gerber and the Board of Regents with VSU acting within the scope of its authority as an agent of the Board of Regents.

*Heidi Cox Defames Dr. Gerber During a University Training Meeting,
Violating Dr. Gerber's Retirement Agreement*

103.    Following Dr. Gerber's forced retirement, Cox gave a presentation to

the USG's Office of Internal Audit, Ethics and Compliance (the "May 2025

Presentation"). On information and belief, people from outside of VSU and the USG

attended this presentation.

104.    Cox's presentation was a hatchet job, beginning with the very first

slide, shown here:



105.    The presentation includes many false statements.

106.    Cox made thinly veiled references to Dr. Gerber throughout her

presentation, making it easy to identify him as the subject of the presentation. For

instance, Cox described Dr. Gerber as the "STEAM Center director" and as the VSU

person associated with a museum.

107.   Cox repeatedly accused Dr. Gerber of "misappropriating state funds," including the $7,000 donation the STEAM Center received from Enay following the VSU Foundation's alleged overpayment of Enay. Here's one example:



108.   As to SciTrek, Cox characterized that entity as Dr. Gerber's "private foundation"—ignoring entirely the plethora of information and documents Dr. Gerber provided to her about the restructuring of the organization after attorneys for VSU and the state determined that the Board of Regents could not accept the "gifts" that came with the SciTrek acquisition by VSU. Here's one example:



109.    As another example, Cox characterizes Dr. Gerber's use of the SciTrek Account to collect proceeds from the VECA fundraiser as a conflict of interest and fraud. Not only did Cox fail to mention that all VECA funds were accounted for in the SciTrek Account, but the Administrative Review report never described this as a conflict of interest. Here is an example:

110.    All these statements are false and reckless. So, too, are similar statements made by Cox.

***Without Notice or Due Process, VSU Unilaterally Designated Dr. Gerber
"Ineligible for Rehire," Violating Dr. Gerber's Retirement Agreement***

111.    Unbeknownst to Dr. Gerber, on June 11, 2025, VSU (through Cox's

colleague, Boddie-LaVan) submitted a request to the USG for approval to designate

Dr. Gerber as ineligible for rehire. The stated reason for this designation was "Ethics

Violations/Misappropriation of Funds." This Ineligible for Rehire form is attached

hereto as Exhibit 5.

112.    The USG Human Resources Administrative Practice Manual policy on

Eligibility for Rehire provides:

> Employees must be notified in writing, at the point of
> separation or as soon as reasonably possible, if they receive a
> conditional or ineligible for rehire designation and may appeal
> their rehire status through established institutional procedures.
>
> …
>
> Each employee's immediate supervisor is responsible for
> initiating the eligibility review at the time of separation.
> Conditional designations must be approved by the college or
> division's highest level administrator (such as dean or vice
> president) and the institution's CHRO or respective designee(s).
> Ineligible for rehire designations must also be approved by the
> terminating institution's president or designee(s), and must also
> be submitted for approval by the System Office Human
> Resources department.

113.    When Dr. Gerber retired, no one at VSU initiated an eligibility review.

Moreover, neither of Dr. Gerber's immediate supervisors—Dr. Sharon Gravett and

Dr. Debbie Paine—ever communicated with Dr. Gerber about initiating a review concerning his eligibility status.

114.   Dr. Gerber did not learn of his ineligibility status until he was approached by Abraham Baldwin Agricultural College for another position on April 22, 2025. Abraham Baldwin Agricultural College is an institution with the University System of Georgia.

115.   On June 26, 2025—two weeks after VSU (through Boddie-LaVan) requested that Dr. Gerber be designated as ineligible for rehire—VSU notified Dr. Gerber that he is "ineligible for rehire" within the USG. VSU's designation of Dr. Gerber as "ineligible for rehire" disparaged and stigmatized Dr. Gerber both within and outside the USG. As such, Dr. Gerber was entitled to a hearing.

116.   Dr. Gerber requested a hearing before VSU's President so that he could present relevant evidence. Instead of setting the required hearing, VSU notified Dr. Gerber that he could submit an appeal.

117.   On June 30, 2025, Dr. Gerber submitted his appeal to VSU. VSU replied to Dr. Gerber's appeal and claimed Dr. Gerber needed to send the appeal to the USG System Office. Dr. Gerber did so.

118.   On July 9, 2025, the System Office told Dr. Gerber that, under the USG Human Resources Administrative Practice Manual policy of Eligibility for Rehire, "the appeal must be heard at the institution level."

119.    On July 9, 2025, Dr. Gerber resubmitted his appeal to VSU, as directed by the System Office. Dr. Gerber supplemented that appeal on July 12, 2025 and July 14, 2025.

120.    On July 23, 2025, VSU President Carvajal denied Dr. Gerber's appeal. As stated in that denial, VSU President Carvajal's "determination constitutes the final institutional decision."

### VSU Violates the Open Records Act

121.    On July 23, 2025, Dr. Gerber, through counsel, sent Open Records Act requests to VSU for certain public records as follows:

    a.  Records after March 1, 2025, that contain the words "$7,000 Enay contribution" or "$7,000 contribution to STEAM Center";

    b.  Records after March 1, 2025, that contain the words "VECA pecan fundraiser" or "fundraising revenues for Valdosta Early College Academy (VECA)";

    c.  All recordings of people interviewed during the administrative review, including, but not limited to, Dr. Gerber; and

    d.  All handwritten or typed notes taken during interviews during the administrative review, including, but not limited to, Dr. Gerber.

122.    VSU did not respond to Dr. Gerber's requests within three business days, as required by O.C.G.A. § 50-18-71(b)(1)(A) and § 50-18-71(d).

123. On July 31, 2025, VSU requested "additional guidance" about the requested records, which was provided to VSU later that same day.

124. Following that additional guidance, Dr. Gerber asked that VSU explain why it failed to comply with the Open Records Act. VSU did not provide any substantial justification or point to any special circumstances that would excuse its delay.

125. Dr. Gerber also asked for VSU's established institutional procedures for appeal of "ineligible for rehire" designations. No records were produced.

126. The absence of public records related to the institutional procedures suggests that no such records exist.

## COUNT I – VIOLATIONS OF 42 U.S.C. § 1983
### (PROCEDURAL DUE PROCESS)

*(against Dr. Richard A. Carvajal, in his official capacity as
President of Valdosta State University)*

127. Dr. Gerber hereby restates and incorporates by reference Paragraphs 1–126 as if fully set forth herein.

128. Dr. Gerber's retirement was involuntarily extracted. VSU lacked good cause to believe that grounds for termination existed because VSU knew that Dr. Gerber had not misappropriated any money.

129. Dr. Gerber operated SciTrek, Inc. and the SciTrek Account with the full knowledge and approval of VSU.

130.    Similarly, Dr. Gerber spoke with numerous VSU officials about his use of the SciTrek Account to collect proceeds from the VECA fundraiser.

131.    So, VSU knew that the allegations that Dr. Gerber attempted to hide his affiliation with SciTrek, and the insinuations that he used the SciTrek Account covertly, were false. Nevertheless, VSU forced Dr. Gerber to choose between termination (at the age of 64) and retirement.

132.    After Dr. Gerber retired, VSU—largely through Heidi Cox—made false statements about the circumstances of Dr. Gerber's departure. Cox stated that Dr. Gerber received a kickback and "misappropriated" state resources for his personal benefit. Neither of these statements were true.

133.    Cox's false statements were made publicly during a meeting that included, on information and belief, people from outside of VSU and the USG. These statements were of a disparaging and stigmatizing nature.

134.    Dr. Gerber has a property interest in continued employment with VSU and in future employment with prospective employers, including other institutions within the USG. Dr. Gerber agreed to retire "with full benefits" and VSU agreed that doing so resolved all matters related to the Administrative Review.

135.    Retirement "with full benefits" includes the benefit of eligibility for rehiring by the same institution within the USG where the retiree previously worked, or rehiring by a different institution within the USG.

136.   The terms of Dr. Gerber's retirement thus created an entitlement and expectation that Dr. Gerber would not be adversely affected by his retirement by being deemed ineligible for rehire.

137.   Dr. Gerber's claim of entitlement arose not only from the employment and retirement agreements, but also from the informal rules and understandings promulgated and fostered by state officials, including the VSU community.

138.   Dr. Gerber expected that he, like many other retired professors, could continue working in academia while retired. This expectation was furthered by the fact that Dr. Gerber's supervisor, Dr. Paine, initiated paperwork recommending Dr. Gerber for professor emeritus to ensure he could continue to guide doctoral students.

139.   Dr. Gerber also had a liberty interest in his right to contract freely with other schools, including other institutions within the USG.

140.   VSU deprived Dr. Gerber of his liberty and property interests by deeming him ineligible for rehire without procedural due process.

141.   VSU deprived Dr. Gerber of due process by not following the established procedures described in the USG Human Resources Administrative Practice Manual policy on Eligibility for Rehire.

142.   Specifically, to designate someone ineligible for rehire, (i) Dr. Gerber's immediate supervisors should have immediately initiated an eligibility review at the time of his retirement, (ii) the conditional determination should have been routed to

the college or division's highest-level administrator, and (iii) VSU's President should have approved it. VSU did not follow any of these procedures.

143.   These procedures were designed to ensure fairness and equitable treatment. By not following these procedures, VSU created an unacceptable risk of an erroneous deprivation of Dr. Gerber's liberty and property interests.

144.   The fiscal and administrative burdens of following the established procedures is minimal and is outweighed by the value of these procedural safeguards.

145.   VSU also deprived Dr. Gerber of due process by failing to establish "institutional procedures" for appeal of "ineligible for rehire" determinations, as required by the USG Human Resources Administrative Practice Manual.

146.   These institutional appeal procedures were designed to ensure fairness and equitable treatment. By not creating institutional appeal procedures, VSU created an unacceptable risk of an erroneous deprivation of Dr. Gerber's liberty and property interests.

147.   The fiscal and administrative burdens of creating institutional appeal procedures is minimal and is outweighed by the value of these procedural safeguards.

148.    VSU could have provided Dr. Gerber a hearing before designating him as "ineligible for rehire," but chose not to do so. To date, VSU has never given Dr. Gerber the opportunity to clear his name at a hearing.

149.    Following the established procedures for determining Eligibility for Rehire and creating institutional appeal procedures are ministerial acts that do not call for the exercise of personal deliberation or judgment. The duty to follow and establish these procedures does not involve an administrative action of a legislative, quasi-legislative, judicial, or quasi-judicial nature.

150.    These ministerial duties were either negligently performed or not performed at all.

151.    The deprivation of Dr. Gerber's rights was a direct and proximate result of the actions described above. As a result of these actions, Dr. Gerber suffered harm, which is continuing.

152.    The "ineligible for rehire" designation has caused, and will continue to cause, Dr. Geber ongoing harm in the form of loss of opportunities to pursue employment opportunities elsewhere in the University System of Georgia.

## COUNT II – BREACH OF EMPLOYMENT CONTRACT
### *(against the Board of Regents)*

153.    Dr. Gerber hereby restates and incorporates by reference Paragraphs 1– 126 as if fully set forth herein.

154.    Dr. Gerber had a valid and enforceable Employment Contract with the Board of Regents. Under this agreement, on June 10, 2024, the Board of Regents offered Dr. Gerber employment as "Professor and Director of STEAM Center" for "the academic year beginning on August 1, 2024 and ending on May 12, 2025." Dr. Gerber accepted the Board of Regents' offer that same day. A copy of the Employment Contract is attached hereto as Exhibit 6.

155.    Dr. Gerber's employment agreement incorporates by reference the USG Human Resources Administrative Practice Manual. Specifically, it states: "This agreement is made expressly subject to the applicable state and federal laws and to the statutes and regulations of this institution and to the Bylaws and Policies of the Board of Regents, which are available for your inspection upon request."

156.    The Board of Regents breached Dr. Gerber's Employment Contract as a Professor and Director of STEAM Center at VSU by failing to follow the USG Human Resources Administrative Practice Manual policy on Eligibility for Rehire.

157.    In June 2025, the Board of Regents did not have the contractual authority to designate Dr. Gerber "ineligible for rehire" under the USG Human Resources Administrative Practice Manual policy on Eligibility for Rehire, but did so anyway.

158.    The Board's actions caused Dr. Gerber harm and continuing damages, including the loss of the opportunity to pursue employment opportunities elsewhere in the University System of Georgia.

159.    Dr. Gerber seeks fees and expenses of litigation under O.C.G.A. § 13-6-11 because the Defendants have acted in bad faith.

## COUNT III – BREACH OF RETIREMENT AGREEMENT
### *(against the Board of Regents)*

160.    Dr. Gerber hereby restates and incorporates by reference Paragraphs 1–126 as if fully set forth herein.

161.    Dr. Gerber had a valid and enforceable Retirement Agreement with the Board of Regents.

162.    Through Dr. Noviello's March 17, 2025 letter and March 25, 2025 email, VSU offered Dr. Gerber the option to "voluntarily separate" from VSU. After receiving clarification from VSU's Chief Legal Affairs Officer, Justin Arrington, that VSU's offer meant that he could "retain all his retirement benefits," Dr. Gerber accepted VSU's offer on March 28, 2025.

163.    The parties agreed that Dr. Gerber's retirement "conclude[d] the matters mentioned in [Dr. Noviello's] March 17, 2025 letter."

164.    Retirement "with full benefits" includes the benefit of eligibility for rehiring by the same institution within the USG where the retiree previously worked, or rehiring by a different institution within the USG.

165.    VSU breached Dr. Gerber's retirement agreement by designating Dr. Gerber "ineligible for rehire."

166.    The context and surrounding circumstances of the email exchange makes clear the parties intended to use email to negotiate and execute a contract.

167.    When entering into the Retirement Agreement, VSU, as an agent of the USG, was authorized to enter into the contract. The USG, as the principal, is bound by all the acts of its agent VSU within the scope of its authority.

168.    By agreeing that Dr. Gerber could retain all his retirement benefits, VSU agreed that Dr. Gerber could work while retired, a common practice in academia at VSU and elsewhere. And by agreeing that Dr. Gerber's resignation resolved the recommendations of the Administrative Review report, VSU agreed that it would not seek to punish Dr. Gerber further. VSU's actions to punish Dr. Gerber breached the implied duty of good faith and fair dealing.

169.    VSU breached the Retirement Agreement by designating Dr. Gerber "ineligible for rehire," which prevented him from working throughout the USG.

170.    Dr. Gerber seeks fees and expenses of litigation under O.C.G.A. § 13-6-11 because the Defendants have acted in bad faith in the transaction.

## COUNT IV – DEFAMATION
### *(against Heidi Cox, in her individual capacity)*

171.    Dr. Gerber hereby restates and incorporates by reference Paragraphs 1–126 as if fully set forth herein.

46

172.    During the May 2025 Presentation, Cox made false and defamatory statements about Dr. Gerber.

173.    Cox gave the May 2025 presentation to an audience that included people outside of VSU. On information and belief, people outside of the USG also attended the May 2025 Presentation.

174.    During the May 2025 Presentation, Cox stated that Dr. Gerber committed "fraud," "misappropriated" state funds intended for the 2023 Summer Camp, and "misappropriated" donations intended for the VECA foundation. These statements were false because Dr. Gerber never misappropriated any money.

175.    To "misappropriate" means to take or use wrongly as by theft or embezzlement.[5] Misappropriation implies a dishonest application of one person's money for another's use.[6]

176.    Dr. Gerber did not misappropriate state funds intended for the 2023 Summer Camp because he never stole or embezzled money. Far from it, the state funds were used for their intended purpose: hosting the 2023 Summer Camp.

177.    Likewise, Dr. Gerber did not misappropriate donations from the VECA fundraiser. All the money Dr. Gerber collected on VECA's behalf was used for

---

[5]    https://www.merriam-webster.com/dictionary/misappropriate; https://www.merriam-webster.com/dictionary/appropriate

[6]    MISAPPROPRIATION, Black's Law Dictionary (12th ed. 2024).

VECA and its students. The balance of the money collected remains available to
VECA in the SciTrek Account.

178.    Cox also falsely claimed that Dr. Gerber received a "kickback" from
Enay.

179.    A "kickback" is a sum of money illegally paid to someone in authority,
usually because of a secret agreement to arrange for a company to receive a lucrative
contract.[7]

180.    Dr. Gerber did not receive a kickback. Contrary to Cox's implication,
Dr. Gerber did not artificially inflate the budget for the 2023 Summer Camp as part
of some secret agreement with Enay Coaching. Rather, Dr. Gerber chose Enay
because of its reputation in this space.

181.    The budget Dr. Gerber submitted represented the best estimate (of
those involved in putting the camp together, including Dr. Gerber) of the cost to run
the 2023 Summer Camp. Dr. Gerber could not award the contract directly; he
submitted the budget through the appropriate channels, and it was approved by VSU
and the Board of Regents.

182.    After Enay was reimbursed, it chose to donate $7,000 to the STEAM
Foundation, not to Dr. Gerber directly.

---

[7]    KICKBACK, Black's Law Dictionary (12th ed. 2024).

183.    Cox knew or should have known these statements were false because she participated in the Administrative Review. During that process, Cox had access to records and interviews that showed Dr. Gerber did not misappropriate money or receive a kickback.

184.    When making these false and defamatory statements, Cox acted with actual malice and intended to cause injury to Dr. Gerber.

185.    Dr. Gerber suffered harm from Cox's false and defamatory statement.

## COUNT V – VIOLATION OF OPEN RECORDS ACT
### *(against Dr. Richard A. Carvajal, in his official capacity)*

186.    Dr. Gerber hereby restates and incorporates by reference Paragraphs 1–126 as if fully set forth herein.

187.    Dr. Gerber sent Open Records Act requests to VSU requesting public records.

188.    VSU did not respond to Dr. Gerber's requests within three business days as required by O.C.G.A. § 50-18-71(b)(1)(A) and § 50-18-71(d).

189.    VSU provided no substantial justification or special circumstance that would excuse its failure to timely produce records.

190.    Dr. Gerber has incurred fees and expenses related to his attempts to obtain records under the Open Records Act.

## COUNT VI – ATTORNEYS' FEES AND EXPENSES OF LITIGATION
### (against All Defendants)

191.    Dr. Gerber hereby restates and incorporates by reference Paragraphs 1–126 as if fully set forth herein.

192.    As a result of the Board and Cox's wrongful conduct, Dr. Gerber has been forced to retain legal counsel and incur the costs and expenses of bringing this action in defense of his rights.

193.    Under 42 U.S.C. § 1988 and Georgia law, Dr. Gerber is entitled to recover from the Board and Cox his attorneys' fees and the costs and expenses of litigation.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Gerber respectfully prays for the following relief:

a. A trial by jury on all such triable issues;

b. Injunctive relief removing the designation of him as "ineligible for rehire" and enjoining the Board of Regents, VSU, and Cox from making further disparaging remarks about Dr. Gerber;

c. Compensatory, special, consequential, incidental, and all other damages allowed by law and in an amount to be determined at trial;

d. Reasonable attorneys' fees, expenses, and costs of litigation; and

e. Such other and further relief as the Court may deem just and appropriate.

Respectfully submitted this 4th day of December, 2025.

/s/ James W. Cobb
James W. Cobb
Georgia Bar. No. 420133
**CAPLAN COBB LLC**
75 Fourteenth Street, NE, Suite 2700
Atlanta, Georgia 30309
Phone: 404.596.5600
Fax: 404.596.5604
jcobb@caplancobb.com

Counsel for Plaintiff Dr. Brian L.
Gerber